UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIO A. JAVIER, Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 3:07-cv-1863 (VLB) |
| DERINGER-NEY, INC., Defendant. | : | September 30, 2009 |

MEMORANDUM OF DECISION GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. #61]

Before the Court is a motion for summary judgment [Doc. #61] filed by the Defendant, Deringer-Ney, Inc. ("Deringer-Ney"). The Plaintiff, Mario A. Javier ("Javier") claims that Deringer-Ney terminated his employment on the basis of his race or national origin, in violation of Title VII of the Civil Rights Act of 1963, as amended, 42 U.S.C. § 2000e and the Civil Rights Act of 1991 (Title VII) and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §46a-60, et seq. Javier also seeks redress under Connecticut common law based on allegations that Deringer-Ney committed fraudulent misrepresentation and intentional infliction of emotional distress. Deringer-Ney argues that Javier has failed to set forth sufficient evidence that would permit a reasonable jury to find that 1) Deringer-Ney fired Javier because of either his race or his Filipino national origin in violation of Title VII and CFEPA ; 2) Deringer-Ney committed fraudulent misrepresentation by falsely indicating a belief that Javier was doing a "great job" as a laboratory supervisor; and 3) the company intentionally inflicted emotional distress by condoning a co-worker's aggression towards Javier.

For the reasons stated hereafter, the Defendant's motion for summary judgment is granted as to all claims.

Procedural History

On January 29, 2007, Javier filed a complaint against Deringer-Ney with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that his September 5, 2006 termination was a discriminatory action. The Plaintiff's complaint was also submitted and filed with the Equal Employment Opportunity Commission ("EEOC") on March 30, 2007. The Plaintiff amended his CHRO complaint on April 9, 2007. On June 6, 2007, the CHRO dismissed the Plaintiff's complaint. The EEOC then adopted the CHRO's findings and also dismissed his complaint on September 20, 2007. Javier received a release of jurisdiction letter from the CHRO on August 17, 2007, [Doc. #1] and then received an EEOC Notice of Suit Rights on September 21, 2007. [Doc. #1]. The Plaintiff initiated his employment action in the State of Connecticut Superior Court by filing a Summons and Complaint on November 14, 2007. [Doc. # 71, Exhibits 8-11]. A summons and complaint was then served on Deringer-Ney on November 28, 2007, and Deringer-Ney removed the case to this Court on December 21, 2007.

On February 25, 2008, Deringer-Ney filed a partial motion to dismiss [Doc. #11], and on July 25, 2008, the Court issued an order [Doc. #37] dismissing: 1) claims that the Defendant denied Javier training and salary increases in violation of both Title VII and CFEPA; 2) a Connecticut common law claim of negligent

**infliction of emotional distress; 3) a claim of negligent misrepresentation, also in violation of Connecticut common law; and 4) the Plaintiff's effort to seek an independent cause of action under U.S.C. §1981a(b). Javier's Connecticut common law claims for intentional infliction of emotional distress and fraudulent misrepresentation survived the Defendant's partial motion to dismiss. [Doc. #37].**

**The parties conducted discovery, and on December 15, 2008, Deringer-Ney filed the instant motion for summary judgment as to the remaining causes of action [Doc. #61]. On February 4, 2009, the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment [Doc. #71] was filed with the Court, with a certification by Javier indicating that it was mailed via postage on February 2, 2009. The accompanying memorandum of law noted:**

> **PLEASE BE ON NOTICE THAT THIS MEMORANDUM IS NOT COMPLETED AT THIS TIME. THIS IS BEING SUBMITTED ONLY TO MEET THE DEADLINE SUBMISSION. AMENDMENT AND OR SUPPLEMENTATION WILL BE REQUESTED AND WILL FOLLOW.**

**[Doc. # 71]. The Plaintiff's incomplete memorandum includes an implication that the Defendant precluded the Plaintiff from conducting discovery and failed to comply with his requests for disclosure and production. In particular, the Plaintiff includes a single page of the Defendant's response to the Plaintiff's First Request for Production of Documents to assert that the "Defendant deliberately refused to provide discoverable information" by asserting that the requested documents did not exist. [Doc. # 71, Rule 56(a)2 Statement]. In its reply memorandum [Doc. #75] Deringer-Ney explains that Defense counsel met with**

**Javier to**

> **discuss various discovery issues and address Plaintiff's concerns about Deringer-Ney's objections and responses to his requests for production. After obtaining clarification on a number of Plaintiff's requests during the meeting, Deringer-Ney produced additional documents and sent Plaintiff a twelve (12) page letter summarizing the meeting and providing further explanation regarding its objections.**

**[Doc. # 75].**

**As of the date of this decision, the Plaintiff has not supplemented his memorandum of law, or filed a motion to either request leave to file a supplement or to request an extension of time. Nevertheless, the Court has parsed the Plaintiff's memorandum and accompanying exhibits in order to surmise the basis for his objection to the Defendant's motion for summary judgment.**

**The Court notes that notwithstanding the Plaintiff's assertion that the Defendant failed to make full disclosure and production with regard to certain communications, the Plaintiff did not utilize tools available under the Federal Rules of Civil Procedure to compel production. The Court's Chambers Practices [Doc. # 3] state that the Court reserves time each Friday afternoon for telephonic discovery conferences. The Plaintiff has not availed himself of this resolution mechanism. The Court further notes that the fact that the Plaintiff has had nearly an additional eight months to supplement his objection, obviates any prejudice that he may have suffered from the alleged lack of timely disclosure and production.**

**Facts**

**The following facts relevant to the Defendant's motion for summary judgment are undisputed unless otherwise noted. During March of 2006, Javier applied for the position of Supervisor of the Analytical Services Laboratory for Deringer-Ney's Bloomfield facility. Javier is originally from the Philippines and is racially identified as Asian. Deringer-Ney hired Javier who began at-will employment for the Defendant on April 5, 2006. As a Supervisor of Analytical Services, Javier oversaw a laboratory that conducted mechanical and chemical testing in Deringer-Ney's Bloomfield facility. Javier also supervised two laboratory technicians, Lena Tan ("Tan"), who is also racially identified as Asian, and Jeanine Phillips ("Phillips") who is racially identified as Caucasian.**

**According to Patricia Holton, Deringer-Ney's Human Resource Manager, at the start of Javier's employment, Tan had been a laboratory technician at the Bloomfield, Connecticut facility for over eight years, and Phillips had been a technician at the facility for over twenty-seven years. [Doc #62, Exhibit 5]. While at Deringer-Ney, Javier was directly supervised by Alex Langford ("Langford"). Javier was also supervised by Jared Strand ("Strand"), and Teresa Morrison ("Morrison"), the Defendant's Human Resources Specialist.**

**Javier contends that Deringer-Ney has a "RULES" policy that identifies corrective actions for offenses. The noted policy includes the corrective action of "Discharge" for the first offense of provoking a fight, and also includes the**

**corrective action of a "Warning" for a first offense of "Insubordination" and "Discharge" for a second offense. [Doc # 71, Exhibit 13].**

**The record reflects that Javier implemented time-consuming and very particular rules that contradicted how Tan and Phillips operated in the laboratory prior to Javier's arrival and that Tan and Phillips both felt that Javier's new requirements hampered their productivity. [Doc. # 62, Exhibit 4]. The record also indicates that Tan perceived Javier as having a short temper and that Javier tended to use an angry and intimidating tone with his subordinates. [Doc. #62, Exhibits 2A and 4].**

**Javier's managerial style prompted complaints to Morrison. [Doc. # 62, Exhibit 2 and 2A]. As a result, Morrison held group meetings to address "tensions in the laboratory and establish better working relationships" between Javier and his two subordinates at the beginning of June, 2006. Morrison's meeting notes and email communications reflect that she was alerted of "communication problems" between Javier, Tan, and Phillips at the beginning of June, 2006, and that she immediately held these meetings to address the noted issues. Id. Morrison was again alerted to communication issues during August 2006, and received reports that Phillips was upset and frustrated by Javier's management style, while Javier was frustrated by what he viewed as Phillips refusal to follow his written instructions. Id. Morrison met with Phillips and Javier separately to encourage Phillips to avoid challenging his authority, and to**

**encourage Javier to recognize that Deringer-Ney's culture was "fairly relaxed" and "not a military environment where people follow orders blindly." Id.**

**The Plaintiff's performance reviews for the months of June and July both included a rating of "Does not meet expectations," for the criterion of "SUITABILITY-Do attitude, personality, and temperament appear appropriate for this kind of work? (Does person match the job?)" [Doc. #62, Exhibit 7]. Javier contends that when he inquired about his negative ratings, Langford indicated "You're doing an excellent job don't worry." [Doc. #71, Exhibit 15].**

**Javier's CHRO complaint affidavit reflects a series of allegations, with minimal detail, about occurrences during his employment. Among these are assertions that: Langford discouraged Javier from instructing Tan to complete a Non Conformance report for failed results; on several occasions, Langford, Morrison, and Strand commented on his animated manner of speaking and heavy accent; Langford and Strand also made discriminatory remarks about Tan's manner of speaking due to her Chinese accent; and that Javier has raised several issues regarding "flaws" in Deringer-Ney's procedures and protocols. [Doc. # 71, Exhibit 18]. Javier has not supplemented the record concerning these matters.**

**On August 17, 2006, Bill Doolittle ("Doolittle") a co-worker in the laboratory, aggressively confronted Javier with an angry tone. According to the Defendant's Human Resource Manager, Doolittle received a verbal warning for his incident with Javier. [Doc #62, Exhibit 5], an appropriate corrective action for insubordination [Doc. #71, Exhibit 13].**

During the morning of September 1, 2006, Javier and Phillips had a volatile verbal exchange regarding a request for a signature that Phillips left on Javier's desk. Javier submitted an email to Morrison relaying his account of the incident and was instructed to report to Human Resources. After the incident, Deringer-Ney Vice President, Garth Boyd, instructed Javier to go home and return to work on September 5, 2006, at which time they could discuss the incident. [Doc. #71, Exhibit 18]. Javier subsequently received a message that instructed him to report directly to Human Resources during the afternoon of September 5, 2006. Morrison's email communications reflect that she conducted an investigation of the incident on the same morning and received eyewitness accounts indicating that, although Phillips raised her voice during the exchange, Javier had managed the situation poorly as a supervisor. The communications also reflect that management at Deringer-Ney resolved to terminate Javier on the day of the incident. On September 5, 2006, Javier was informed of his termination and complained that the termination decision was "discriminatory." Javier did not make any allegations of discrimination prior to this date.

On September 5, 2006, the Defendant also issued a verbal warning to Phillips for inappropriate behavior and insubordination due to the September 1, 2006 incident with Javier.

**Standard**

**Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." Huminski, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).**

**The non-moving party however, "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,**

**or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted). A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible. Ying Jing Gan v. City of N. Y., 996 F.2d 522, 532 (2d Cir. 1993).**

**"Claims under CFEPA are analyzed in the same manner as those under Title VII." Kearney v. City of Bridgeport Police Dep't, 573 F. Supp.2d 562, 573 (D. Conn. 2008). As a result, Javier's discrimination claims under Title VII and the CFEPA are all subject to the McDonnell Douglas analysis:**

> **To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [test] laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.**

**McPherson v. N. Y. City Dept. of Educ., 457 F.3d 211, 215 (2d Cir. 2006) (internal citation omitted).**

**Lastly, pro se litigants are entitled to an "accessible" explanation of Rule 56 of the Federal Rules of Civil Procedure, and the implications of a motion for summary judgment:**

> **We take this opportunity to briefly discuss the interplay between Rule 56 of the Federal Rules of Procedure ("Rule 56") and the pro se litigant who does not move for summary judgment. And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.**

**Irby v. N. Y. City Transit Auth., 262 F.3d 412, 413-14 (2d Cir. 2001). The Defendant has complied with this requirement [Doc. #61, Exhibit A].**

**Analysis of the Javier's Title VII Discrimination Claims**

**To establish a prima facie case of racial or national origin-based discrimination under Title VII, and thus also under the CFEPA, Javier must demonstrate that "(1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered [an] adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).**

**The parties agree that Javier satisfies the first and third prongs of a prima facie case by virtue of his Filipino origin, and his termination on September 5, 2006.**

**With regard to the second prong, Deringer-Ney contends that the record clearly demonstrates that Javier's performance was unsatisfactory. To demonstrate satisfactory job performance, a plaintiff**

> **need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him.**

**Powell v. Syracuse Univ., 580 F.2d 1150, 1155. (2d. Cir, 1978). The Defendant offers McLee v. Chrysler Corp.,109 F.3d 130 (2d Cir. 1997), as an analogous fact pattern. In McLee, the Second Circuit affirmed summary judgment of the plaintiff's Title VII claim due to his failure to demonstrate satisfactory performance. Id. at 135. In that case, the plaintiff's 120-day performance review noted several performance deficiencies, including tardiness and poor work product. Id.**

**In the instant action, the record reflects that as Supervisor of the Analytical Services Laboratory, the Plaintiff's central responsibilities included the supervision of two subordinates, who each had several years of experience at the company. The Plaintiff developed a discordant relationship with both technicians, one of whom was also of Asian decent. This discord required intervention from his supervisors and Human Resources by his second month of employment. The fractured dynamic required yet another intervention during August, 2006. Coupled with the final incident prompting his termination on September 1, 2006, the Plaintiff's performance during his short tenure indicates that Javier, at a minimum failed to create an appropriate managerial dynamic, and strongly suggests that he negatively impacted the Defendant's working environment and his subordinates' productivity and job satisfaction.**

**Consistent with this finding, Deringer-Ney negatively assessed the Plaintiff's attitude, personality, and temperament during his reviews at the end of June and July. Javier's performance can at best be supported by Langford's isolated assurance that he was doing an "excellent job" and evidence that Phillips exhibited some level of resistance and insubordination in response to Javier's management techniques. This evidence however, is strongly outweighed by evidence demonstrating that Javier's management style was a poor fit for the company's dynamic, including the length of Tan and Phillips' respective tenures with the company before Javier's arrival. In addition, Langford's comment preceded the dispute that occurred on September 1, 2006 despite the company's previous interventions to encourage better management techniques. Additionally, as a supervisor, Javier was required to manage effectively, a requirement that included avoiding and defusing conflicts. The record reflects that Javier tended to do the opposite during his interactions with both Phillips and Tan.**

**The record, even reviewed in the light most favorable to the non-moving party, indicates that a reasonable trier of fact cannot conclude that Javier's performance was of a sufficient quality to merit continued employment. However, even assuming arrguendo, that Javier had a satisfactory performance and can meet the fourth prong based of his prima facie case based on his allegations that his supervisors made racially disparaging comments about both the Plaintiff's and Tan's manner of speaking, Javier's claim still fails.**

**The very same employment concerns serve as the Defendant's legitimate non-discriminatory reason for terminating Javier's employment and the Plaintiff fails to present any evidence that the proffered reason for his termination is pretextual, let alone a pretext for discrimination. Instead, Javier merely attests "I personally believe, know and feel that the Sept 1, 2006 incident is a pretext reason for my discharge. That the true reason is I am not Caucasian and that my national origin is the Philippines that's why respondent easily discriminated against me resulting to my discharge from work favoring an insubordinate Caucasian employee not of Philippine origin." [Doc. # 71, Exhibit 18]. However, Javier "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World, 922 F.2d at 121 (internal quotations and citations omitted).**

**Accordingly, the Defendant's motion to dismiss is granted as to the Plaintiff's Title VII and CFEPA discrimination claims. Furthermore, the Defendant's motion is granted to the extent that the Plaintiff's allegation that Deringer-Ney "unlawfully retaliated against him for protesting defendant's wrongful conduct and have violated plaintiff's common law and statutory rights" [Doc. #1 ] can be interpreted as a claim for relief under a theory of retaliatory discharge. The Plaintiff has failed to make any showing that he engaged in a protected activity "to protest or oppose statutorily prohibited discrimination." See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C.**

**§2000e-3). Instead, Javier first alleged discrimination as he learned of his termination.**

**Analysis of the Plaintiff's Fraudulent Misrepresentation Claim**

**Javier also claims that Langford's statement "You're doing an excellent job don't worry," was a fraudulent misrepresentation. Under Connecticut common law, a claim for fraudulent misrepresentation requires proof that (1) a false misrepresentation was made as a statement of fact; (2) it was untrue or known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party acted upon the false representation, to that party's detriment. Weisman v. Kaspar, 233 Conn. 531, 539 (1995). Javier fails to present any evidence beyond Langford's statement. As a result, assuming but not deciding that a trier of fact could reasonably determine that Langford knowingly made a false representation, the Plaintiff has not demonstrated that the statement was made to induce Javier to act on the statement to his injury. Therefore, the Defendant's motion for summary judgment as to the Plaintiff's claim for fraudulent misrepresentation is granted.**

**Analysis of Javier's Intentional Infliction of Emotional Distress Claim**

**Javier also argues that Deringer-Ney intentionally inflicted emotional distress by condoning Doolittle's altercation with Javier during August 2006. To**

**prove intentional infliction of emotional distress, Javier must show that (1) Deringer-Ney intended to inflict emotional distress, or that he knew or should have known that emotional distress was a likely result of its conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the Plaintiff's distress; and (4) the emotional distress sustained by the Plaintiff was severe. The Plaintiff has failed to provide facts or arguments that satisfy any of the elements of this claim. The record only notes a vague description of Doolittle's encounter with Javier, yet demonstrates that the Defendant took disciplinary action in response to Doolittle's behavior. Thus, the Plaintiff fails to demonstrate any conduct by the Defendant that was likely to cause emotional distress, and also fails to provide evidence that he suffered emotional distress. Furthermore, to the extent Javier alleges that Deringer-Ney condoned Doolittle's behavior by departing from its disciplinary procedures by issuing a warning instead of discharging Doolittle, the Court notes that Doolittle's alleged behavior is very analogous to the alleged manner by which Javier confronted Tan in June, 2006. In Tan's 2008 Affidavit she notes that**

> **One time, early in the morning, I was testing samples in the Laboratory and had the samples out on my desk. . .When Mr. Javier came into the Laboratory for the day and saw the samples. . .he began yelling at me. Mr. Javier got so angry over this that his eye balls seemed to be coming out of his head and his arms were flailing. I was afraid he was going to hit me. I remained quiet afterwards because I was afraid to say anything in my defense; I did not want to set him off again.**

**[ Doc. # 62, Exhibit 4]. Like Doolittle, Javier was not discharged for this encounter and was instead encouraged by his supervisors to use a less**

**intimidating approach.**

**Accordingly, Deringer-Ney's motion for summary judgment is also granted as to Javier's claim that he suffered an intentional infliction of emotional distress under Connecticut common law.**

**CONCLUSION**

**The Defendant's motion for summary judgment [Doc. #] is GRANTED as to all of the Plaintiff's remaining claims and the Clerk of the Court is directed to CLOSE the case file.**

**IT IS SO ORDERED.**

**/s/**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 30, 2009**